## ROBINETT WADE v. THE STATE.

1. JURY LAW — CASE STATED.— Being tested upon his *voir dire*, a proposed juror stated that he had heard all of the evidence in the preliminary examination of the case before a magistrate, but that he had neither formed nor expressed an opinion which would influence him in finding a verdict. The State challenged the juror for cause, and the court sustained the challenge, over objection of the defendant. *Held*, error, whether prejudicial or not. See the opinion *in extenso* on the subject.

2. SAME.— That the defendant had not exhausted his peremptory challenges does not excuse judicial infringement of the jury law in this respect.

APPEAL from the District Court of Waller. Tried below before the Hon. W. H. BURKHART.

The defendant was charged by indictment with the murder of one Sam Smith, in Waller county, on the 19th day of May, 1881. He was found guilty of murder in the second degree, and his punishment was assessed at five years in the penitentiary.

Aaron Smith, for the State, testified that on the morning of the killing, himself, Charley Singleton and the deceased started from the house of the witness, about one mile south of Larry Manix's place, to Levi Stark's place near Hempstead, to get a horse which belonged to the witness. The road led them through Larry Manix's field. When they had gone about a quarter of a mile, they saw the defendant in the field on horseback, talking to some hands at work. When the defendant saw the witness and the deceased, he came across the field to the road and up to the deceased, and said to him: "Sam, what were you doing at my house last night?" at the same time drawing a pistol. The deceased answered "I went there to see you." The defendant thereupon presented his pistol and fired on the deceased, but missed him. The deceased then dismounted and tried to dodge behind his

horse, begging the defendant not to shoot him. The defendant reached over the horse and fired again, striking the deceased in the back. The deceased then ran, fell down, got up and started again, but was followed by the defendant, and again shot in the back of the head. He fell and instantly expired. Immediately before the last shot, the witness got between the defendant and the deceased and begged the former not to shoot again. The defendant turned his pistol towards the witness and told him if he did not get out of the way he would kill him. After the killing the defendant rode off with his pistol in his hand.

Charley Singleton testified, for the State, to the same effect, in detail, as did the witness Aaron Smith.

Logan Hunter testified, for the State, that on the morning of the 19th of May, the day of the killing, the defendant came to his field, a few hundred yards from the place of the homicide, and asked the witness if he had seen Sam Smith, and said that he was going to kill the deceased, if it was the last thing he did. The witness advised the defendant to go home, shut himself up in the house and pray, but he said that he was going to kill Sam Smith. He said that Smith had been at his house the night before. He then rode off in the direction of his home. In a few moments the witness heard the reports of a pistol, and ran over towards where the firing was. *En route* he met the defendant coming from that direction, pistol in hand.

Lewis Hogan testified, for the prosecution, that the deceased was living at his house at the time that he was killed. He left the witness's house on the morning of the killing, going to Aaron Smith's to accompany him to Stark's near Hempstead. The witness saw no more of him alive. The witness was not present at the killing, but arrived on the ground a short time afterwards, and found the dead body of the deceased near the ravine. On

the night before, just after supper, the deceased left the witness's house, saying that he was going to see the defendant about digging a well for Mr. Gray. He returned about eleven o'clock and told the witness that he went to see the defendant about digging the well, that the defendant caught him in his house, and they had a fuss. The witness knew that on the 2d day of May the deceased engaged the defendant to assist him to dig a well for Mr. Gray, and to commence the work as soon as the deceased was through chopping cotton. The deceased got through chopping cotton on the 18th day of May, 1881. The defendant and the deceased belonged to the same church, and called each other "brother." They met frequently for short times, before the killing.

Henrietta Wade testified, for the defense, that she was the wife of the defendant. On the night of May 18, 1881, she was at home in her house on Larry Manix's place. Her husband and the parson had gone to the church to attend prayer meeting. The witness blew out the light just after they left, and started to undress to go to bed. Her baby began to cry and the witness lay down across the foot of the bed to nurse it to sleep before undressing. The door was open about six inches. While lying there nursing the baby she heard some one step up on the gallery and knock at the door. She demanded to know who was at the door, but received no answer. The person entered and walked up to the bed and asked her where the defendant was, and she then recognized the deceased, and told him that the defendant was not at home. She told him to leave, that if the defendant returned and found him at the house, he knew there would be a difficulty. The deceased would not leave as requested, but stood by the bed putting his hand on the witness's bosom. The witness pushed him off, but he would not leave and persisted in placing his hand on her bosom. The defendant presently stepped up on the gallery, and asked, "who is

that in there?" The witness did not answer and the deceased said nothing. The defendant again asked who was in the house. The witness waited for the deceased to reply. She made no answer herself. The defendant then said, "I know there is somebody in there," and as he came into the room the deceased ran for the door. The defendant caught him as he ran out, but after scuffling awhile the deceased broke loose and ran off. The defendant and the witness were regularly married under a license by Parson Isaac Smith, in 1872. Since then she and the defendant have been separated more than once,—one time for about a year. The witness was the mother of two children, one of which was born while she was separated from her husband. She and defendant had been together some eight or nine months when the killing occurred.

Sandy Williams testified that he went to the defendant's house on the night before the deceased was killed, getting there just after dark. Just as the witness rode up to the house the defendant reached the house, coming from church. He passed into the house, and presently, after a sound of scuffling, the witness saw the deceased run out of the house with the defendant after him. The deceased was in white garb, and the witness thought then and still thinks that he had on nothing but shirt and drawers. The deceased left his hat, which the defendant secured. The witness is in the habit of visiting the defendant's house frequently, and sometimes when the defendant himself is not at home.

Ed. Doswell, a tenant on the Manix place, testified for the defense that on the night before the deceased was killed, the deceased came to the house of the witness between 8 and 9 o'clock, and said that he wanted to borrow a hat of the witness; that the defendant had got his. He told the witness that he had been down to the defendant's house to see him about digging a well for Mr. Gray, and

was sitting on the gallery when the defendant came up and attacked him, and got his hat in the scuffle which followed. The witness did not credit his story about being seated on the gallery when the defendant came up, and disputed it, and said to him "where there is so much smoke there must be some fire." There had been much scandal for a long time involving the deceased and the defendant's wife. The defendant and his wife had separated once or twice about the deceased. The witness had never heard even a suspicion expressed of trouble between them about any other man. The scandal about Mrs. Wade and the deceased continued after she and the defendant came together after the last separation. The deceased claimed to be the father of Mrs. Wade's youngest child. The deceased had on his pants when he came to the witness's house. He told the the witness that morning that he was going to the defendant's house that night to see the defendant about digging a well.

Ben Alexander testified for the defense that he was a tenant on the Manix place, and was sexton of the church. The defendant and the deceased were both members of the church, the defendant being a regular attendant at church meetings. It was a regular custom to have prayer meeting on Wednesday night, at which meetings the defendant was always present. This fact was generally known, and was well known to the deceased. The night before the killing, which was Wednesday night, the regular prayer meeting was held. The defendant and the parson came to the church together. After a prayer, it was discovered that the books had been left at the defendant's house, and the parson sent the defendant back home to get them. The defendant was gone perhaps an hour, when he returned, and sent into the house for the parson, and the prayer meeting broke up. There was a great deal of excitement on account of the defendant having caught the deceased in his house. For a long

time there had been much scandal throughout the neighborhood, coupling the names of the deceased and the defendant's wife. The matter was once before the church, and the deceased was tried on charges involving his conduct towards Mrs. Wade, but nothing could be made of it. The defendant and his wife several times separated on account of the deceased. The witness had never heard of a suspicion involving any other man in the scandals about Mrs. Wade,—had never heard of improper conduct on her part with any man other than the deceased. The separations of husband and wife were always on account of the deceased. Some two or three months before the killing, the witness saw the deceased with Mrs. Wade's youngest child in his arms. Deceased asked the witness if he could observe in the child a resemblance to himself, and told the witness that the child was his. He said that the defendant was afraid of him, and that he did not care for the defendant. The witness saw Sandy Williams at the Quarters after the meeting was over.

Forest Childs testified for the defendant that he was at church on the Larry Manix place on the night before the homicide. When he went up to the church he saw the deceased sitting at the root of a tree on the outside of the church. The deceased asked for a chew of tobacco, and requested the witness to say nothing about seeing him there that night. While the deceased and the witness were talking, the defendant and the parson passed them within a few feet and went into the church. The witness then went into the church, and soon went to sleep, and slept until the conclusion of the service.

Chris McKenzie testified for the defendant that he lived a mile or two from Larry Manix's place, and about the same distance from the defendant's house. In December, 1880, the defendant with his family moved to the witness's house to live, making a contract with the witness to farm during the year 1881. The defendant told

the witness that he left the Manix place and came to live with the witness in order to get rid of the deceased and secure peace,— that the deceased persisted in making trouble in his family. While he was at the witness's house, the deceased commenced visiting there. The witness remonstrated with the deceased about his conduct with the defendant's wife. The deceased spoke of the youngest of Mrs. Wade's children as his child. The witness told him that he should be ashamed of himself, and that he, the witness, was afraid for him. His reply was that the defendant was nobody and was afraid of him, or that he, defendant, would have been after him, deceased, long before. The defendant stayed on the witness's place until February, 1881, when he broke up and went back to the Manix place. He did not tell the witness why he went back, but the witness supposed that it was because he found that he could not escape the deceased by remaining at the house of the witness.

Bob Ewing testified for the defense that he saw the deceased, on the morning of the killing, at Lewis Hogan's. He told the witness that he went to the defendant's house the night before to see him about digging a well; that the defendant was not at home when he got there; that while he was sitting in the room on a trunk, the defendant came home and caught him in the house; that the defendant's wife, before the return of the defendant, told him to leave; that when the defendant came into the house he commenced stirring up the embers in the fireplace, when he, the deceased, broke to run, but was caught by the arm by the defendant; that he broke loose from the defendant and got away, and that if he had had a pistol he would have killed the defendant.

This witness on cross-examination stated that he testified before the justice of the peace on the preliminary trial of this case, and that he testified to the facts above stated. The State introduced the copy of the evidence

taken before the examining court, from which it appeared that the witness had not testified to any of the facts above stated.

G. B. Dixon, Jr., testified, for the defense, that he occupied the position of justice of the peace. The defendant came to the witness's house one evening about dark, some four or five months before the killing of the deceased, and asked to see the witness privately. He told the witness in a private interview that he came for advice,— that the deceased had been intruding between him and his wife and he wanted to know if there was any law to protect him, and whether or not he would, under the circumstances, be justified in killing the deceased. The witness told him that his advice was to let the woman go to the d—l, but that he would give him a letter to R. E. Hannay, the county attorney, who could better advise him.

Pinchback testified that, on the night before the killing, the deceased came to his house, and was sitting on the gallery until the church bell began ringing, when he got up and left, saying he was going to church.

D. N. Harris, D. S. Cuney and J. B. Gee testified that they had known the defendant ten or fifteen years; that he had lived during all that time in the immediate neighborhood, and that he had borne a good character as a quiet, peaceable and inoffensive man, and was considered rather timid.

J. B. Gee also testified that he was constable, and that he had the body of the deceased searched about three or four hours after his death. A loaded five-shooter was found in the hip pocket of his pants. The deceased had been dead about the half of an hour when the witness took charge of the body. There were at that time a dozen or more persons around and about the body. The defendant voluntarily surrendered to the witness the night of the homicide.

*T. S. Reese*, for the appellant: The juror Washington was a qualified juror. The juror answered the statutory questions all satisfactorily; but when further questioned by the court and the district attorney, answered that he had heard the testimony on the examining trial and was acquainted with the parties. On this ground alone the court ruled that he was disqualified. Code Criminal Procedure, art. 626; *Parchman* v. *State*, 2 Texas Ct. App. 229; *Monroe* v. *State*, 23 Texas, 210; *Rothschild* v. *State*, 7 Texas Ct. App. 519.

The error committed by the court in regard to the juror Washington entitled appellant to a new trial notwithstanding the fact that he had not exhausted his peremptory challenges when the jury was completed. The action of the court in allowing the challenge for cause of the juror was excepted to by appellant, and was also made one of the grounds of the motion for a new trial. Among various qualifications of the bill of exceptions, as presented by appellant (which, however, do not qualify the essential meaning of the bill as originally presented to the court), the court interpolates the fact that after the jury was selected appellant had eleven peremptory challenges left. *Hill* v. *State*, 10 Texas Ct. App. 618.

If the action of the lower court should be sustained in this case, it is difficult to see how the District Court is to be controlled in its action in impaneling juries, so long as the errors committed are confined to putting jurors off the panel.

It is contended by appellant that he had an undoubted right to have this particular juror sit upon the trial of his cause, unless he was gotten rid of in some manner provided by law. He had been regularly chosen upon the special venire; and when his name was called, and he was questioned as to his qualifications, his answers satisfied every requirement of the statute as to his being a qualified juror. The court, as appears from the qualifi-

cations to the bill of exceptions, was not satisfied that
the juror was an impartial juror.   But the court founds
its failure to be satisfied upon this point solely upon the
fact that the juror had heard the testimony on the exam-
ining trial and was acquainted with the parties.   No
other questions were asked the juror, but upon these
answers he was held not a competent juror.   It is sub-
mitted that there is nothing in the letter, the spirit or
the general policy of the law which leaves so large a
measure of discretion to the court in a matter of this
kind.   If there had been anything suspicious in the man-
ner of the juror, or in his answers, the case might have
been different; but the court simply laid down the broad
rule that having heard the testimony and being ac-
quainted with the parties disqualified a juror, and that
such person, in spite of his answers to the contrary, was
bound to have formed an opinion that would influence
him.

This proposition is not only inconsistent with plain
statutory provisions, but is contradicted by the common
experience of mankind.

The District Court undertook to hedge against its error
on this point by qualifying the bill of exceptions with a
statement that appellant did not exhaust his peremptory
challenges.

Without doing more than referring to the fact that it is
the office of a bill of exceptions to show the ruling of the
court upon the particular point, in which a contingency
occurring during the trial, totally disconnected from the
ruling, can have no proper place, I call attention, without
quoting, to the language of Mr. Justice Hurt, in the
opinion of the court in the case of *Hill* v. *State*, 10 Texas
Ct. App. *supra*.   When a qualified juror is erroneously
discharged from the panel, over the objection of the
defendant, the consequences of the error to him could
not be obviated by any number of challenges.   The

rulings of the court in cases where an obnoxious juror was erroneously retained upon the panel, when the defendant had it in his power to have peremptorily had him put off, are not in any way applicable to this case.

*H. Chilton,* Assistant Attorney General, for the State.

Willson, J. The defendant was convicted of murder in the second degree and his punishment assessed at five years' confinement in the penitentiary. The most serious objection urged against this conviction, and the only one which we deem it necessary to consider, is the action of the court in setting aside a juror upon the challenge of the district attorney for cause, when, as the defendant claims, the juror was a qualified juror, and not subject to a challenge for cause.

The juror, upon being interrogated as to the state of his mind with regard to the case, stated that he had not formed or expressed any opinion in the cause which would influence him in finding a verdict,— that he heard all the testimony produced upon the preliminary examination of the case before a magistrate, but had formed no opinion that would influence him in trying the case. Having thus answered he was challenged for cause by the district attorney, and the court sustained the challenge and set aside the juror, over the objections of the defendant; and the defendant thereupon excepted and took his bill of exceptions to this action of the court.

The question thus raised is one which, so far as we are advised, has not been adjudicated in this court, or in our Supreme Court. We have found no reported case in this State where the question has been presented. The statute upon the subject appears to be plain enough. It provides that " a challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. (Code Crim.

Proc. art. 636.)   One cause for challenge is "that from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as will influence him in his action in finding a verdict." (Code Crim. Proc. art. 636, sub. 13.)

It does not appear that the juror in this case had formed any conclusion whatever as to the guilt or innocence of the defendant. He answered that he had formed no opinion that would influence him in the case.   True, he may have formed an opinion which in his judgment would not influence his verdict; but his answer does not show that he had formed any opinion whatever as to the guilt or innocence of the defendant.   The mere fact that he had heard the evidence in the case on a prior trial did not of itself disqualify him as a juror.   (*Parchman* v. *State*, 2 Texas Ct. App. 228.)   There must be established in his mind a conclusion as to the guilt or innocence of the accused, and this conclusion must be such as will influence him in his verdict.   It does not appear that such was the condition of this juror's mind, and we are clearly of the opinion that he was qualified to serve as a juror in the case.

A question similar to the one now under discussion came before this court in the case of *Hill* v. *State*, 10 Texas Ct. App. 618.   In that case the judge, without the consent of the defendant, excused one of the regular venire summoned to try the case, because of sickness in his family.   It was contended by the State in that case, as it is in this, that, even if the action of the court was erroneous, it had wrought no injury to the defendant, as he had not exhausted his peremptory challenges.   In discussing the subject, this court said: "That the defendant had not exhausted his peremptory challenges cannot in the least degree affect the question.   He had a right to that juror,— a right given to him by the law of the land. He may have had fifty peremptory challenges remaining,

but we are at a loss to understand in what manner he could have exercised these challenges so as to restore the excused juror. Challenges are for the purpose of ridding the jury of obnoxious jurors, but can never replace one who has been wrongfully or rightfully excused."

It has been settled by this court that the rulings of the court in organizing a jury are not revisable unless they infringe the law or prejudice the accused. (*Ray* v. *State*, 4 Texas Ct. App. 450; *Gardenhire* v. *State*, 6 Texas Ct. App. 147.) In this case we think the action of the court in setting aside the juror upon the challenge of the district attorney for cause was an infringement upon the law, though it may not have operated to the prejudice of the defendant; and for this error the judgment is reversed and the cause remanded.

*Reversed and remanded.*